Mary Ann MAYWALT, Mary White, John Vosefski and Vivienne Galligan, J. Richard Aboud DDS, Inc. Defined Benefit Pension Plan, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

PARKER & PARSLEY PETROLEUM COMPANY, Smith Barney, Harris, Upham & Co., Barrie M. Damson, William T. Ouzts, Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky, Garth M. Ramsay, Scott D. Sheffield, Herbert C. Williamson, Timothy M. Dunn, James D. Moring, Robert J. Castor, A. Frank Kubica, Defendants.

No. 92 Civ. 1152 (RWS).

United States District Court,
S.D. New York.

Oct. 3, 1994.

See also: 155 F.R.D. 494.

Kaplan & Kilsheimer (Robert N. Kaplan, Richard J. Kilsheimer, of counsel), New York City, Sullivan, Hill, Lewin & Markham (David R. Markham, Michael A. LaBazzo, of counsel), San Diego, CA, Bradford & Decker (Donald R. Bradford, John R. Decker, of counsel), Tulsa, OK, Wolf Popper Ross Wolf & Jones (Stephen D. Oestreich, Roy L. Jacobs, of counsel), New York City, for plaintiffs.

William C. House, New York City, Young & Bearden (Warren F. Young, of counsel), Tulsa, OK, for Objecting Class Representatives.

Stroock & Stroock & Lavan (Melvin Brosterman, of counsel), New York City, Johnson & Gibbs, P.C. (Lewis T. Leclair, Lori A. Leu, of counsel), Dallas, TX, for defendants Parker & Parsley Petroleum Co., Scott D. Sheffield, Herbert C. Williamson, III, Timothy M. Dunn, James D. Moring, Robert J. Castor, and A. Frank Kubica.

Lynn, Stodghill & Melsheimer, L.L.P. (Michael P. Lynn, of counsel), Dallas, TX, Meister, Leventhal & Slade (Jeffrey C. Slade, of counsel), New York City, for defendants Barrie M. Damson and William T. Ouzts.

O'Melveny & Myers (Eugene Hanson, Andrew Frackman, of counsel), New York City, for defendants Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky and Garth M. Ramsay.

## OPINION

SWEET, District Judge.

This class action (the "*Maywalt* Action") arises out of a transaction (the "Transaction") by which oil and gas limited partnerships were consolidated into a new entity pursuant to an exchange agreement. Former limited partners of these partnerships (the "Plaintiffs" or "Class Members") bring this action against the general partner, the new company created through the exchange agreement, various individual officers and directors of the general partner, and the investment banking firm which rendered a fairness opinion regarding the Transaction. The Plaintiffs allege various federal securities and common law claims.

The Plaintiffs and the Defendants Parker & Parsley Petroleum Company ("Parker & Parsley"), Scott D. Sheffield, Herbert C. Williamson, Timothy M. Dunn, James D. Moring, Robert J. Castor, and A. Frank Kubica (collectively, the "Parker & Parsley Defendants") have moved for an Order granting final approval of the proposed stipulation of settlement among the parties (the "Proposed Settlement") filed with this Court on April 12, 1994. A number of objections to the Proposed Settlement have been received, most notably, by certain of the Class Representatives.

Also before the Court are two fee applications—one from the law firms that represented the plaintiff class ("Class Counsel") and another from Thomas Olick ("Olick"), a Class Member who claims to have incurred consulting fees and expenses on behalf of the class.

Olick has also moved for an extension or re-opening of the deadline for the filing of Notices of Claims.

For the reasons set forth below, the settlement is fair, reasonable, and adequate and the motion to approve the Proposed Settlement is granted. The fee application of Class Counsel is granted without the requested application of a multiplier. Olick's fee application is denied, except as noted below, as is his motion to extend or re-open the Notice of Claim deadline.

### The Parties

The Plaintiffs, former investors in oil and gas limited partnerships, brought this action as individuals and as class representatives for a class of investors who formerly held interests in one or more of five limited partnerships organized by the Damson Oil Corporation ("DOC") and in which DOC served as general partner. These partnerships (collectively, the "Damson Limited Partner-

ships") were Damson Energy Company, L.P. ("Damson Energy"), Damson Institutional Energy Limited Partnership ("Damson Institutional"), Damson Income Energy Limited Partnership ("Damson Income"), Damson 1983–84 Oil & Gas Income Fund–Series 1985–1 ("Damson 1985–1"), and Damson 1984–85 Institutional Oil & Gas Income Fund–Series 1985E–1 ("Damson 1985E–1").

Defendants Barrie M. Damson, William T. Ouzts, Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky, and Garth M. Ramsay were officers and directors of DOC ("DOC Defendants").

Parker & Parsley is the company formed by the consolidation of the Damson Limited Partnerships with certain other partnerships ("Parsley & Parker Partnerships"), and it is this transaction, culminating in the creation of Parker & Parsley, that gave rise to the claims in this action. Officers and directors of Parker & Parsley named as individual defendants are Scott D. Sheffield, Herbert C. Williamson, III, Timothy M. Dunn, James D. Moring, Robert J. Castor, and A. Frank Kubica.

### Prior Proceedings and Facts

The prior proceedings in this action are set forth in the previous opinions of this Court, familiarity with which is presumed. *See Maywalt v. Parker & Parsley Petroleum Co.,* 808 F.Supp. 1037 (S.D.N.Y.1992) (dismissing all claims against Defendant investment bankers Smith Barney Harris Upham ("Smith Barney") and disposing of various other motions) (*"Maywalt I"*); *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51 (S.D.N.Y.1993) (certifying class pursuant to Rule 23(a)(4), Fed.R.Civ.P.) (*"Maywalt II"*); *Maywalt v. Parker & Parsley Petroleum Co.,* 155 F.R.D. 494 (S.D.N.Y.1994) (denying Class Representatives' motion to discharge Class Counsel) (*"Maywalt III"*).

The first settlement hearing in the *Maywalt* Action took place on June 22, 1994, the same day this Court issued *Maywalt III,* denying the Class Representatives' motion to

discharge Class Counsel. An eleventh hour notice appealing that denial was filed by the Class Representatives late in the afternoon of Friday, July 15, 1994.[1] At the continuation of the settlement hearing, on Tuesday, July 19, 1994, the Court ruled that an order denying a motion to discharge Class Counsel was not immediately appealable pursuant to 28 U.S.C. § 1291 (1985). *See* Hearing Trans. of July 19, 1994 at 28–30 (making reference to *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 179 (2d Cir.1990), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991)); *Richardson–Merrell Inc. v. Koller,* 472 U.S. 424, 430–32, 105 S.Ct. 2757, 2760–62, 86 L.Ed.2d 340 (1985) (O'Connor, J.) (clarifying *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (holding orders denying motions to disqualify counsel in civil cases not appealable as final decisions under § 1291 or under the "collateral order" doctrine as set forth in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949))).

Only those facts relevant to the Settlement process are presented below.

### Settlement Negotiations

Settlement negotiations concerning the New York State Supreme Court companion action, *Lindenauer v. Damson,* Index No. 5582/91 (the *"Lindenauer* Action"), commenced prior to the actual filing of the *Maywalt* Action. The *Lindenauer* Action was filed before the closing of the Transaction and was the only action by Damson investors pending for some time. Apparently at the numerous phone and in-person settlement conferences[2] various settlement proposals were discussed, including the notion of issuing warrants for Parker & Parsley common stock to putative Class Members. Notwithstanding these lengthy negotiations, no agreement for the *Lindenauer* Action was reached.

---

1. This appeal was subsequently dismissed by the Court of Appeals for the Second Circuit on August 30, 1994.

2. The counsel present at these negotiations were Lewis LeClair, for the Defendants, Stephen Oestreich and Roy Jacobs for the Plaintiffs, and Mark L. Withrow for Parker & Parsley.

In February of 1992, Class Counsel filed the *Maywalt* Action in this Court. According to the DOC Defendants, during the pending settlement negotiations in the *Lindenauer* Action between LeClair and Jacobs, the Parker & Parsley Defendants are said to have offered $3,000,000 to the Lindenauer plaintiffs. In the ensuing months, Parker & Parsley upwardly revised their settlement proposal to an amount between $5,000,000 and $6,000,000, but only if such a settlement would fully release the Defendants from all claims in both the *Lindenauer* and *Maywalt* Actions.

From the summer of 1992 and into 1993, the settlement negotiations continued to no avail. At this point, David Markham and Michael LaBazzo of Sullivan, Hill, Lewin & Markham entered the settlement fray, as putative Class Counsel for the Maywalt Plaintiffs. In early 1993, this Court then suggested that the settlement process be supervised, and, as a result, Magistrate Judge Leonard Bernikow was designated to oversee the ensuing settlement negotiations. The first settlement conference before Magistrate Judge Bernikow occurred in June of 1993. Ultimately the parties participated in five in-person and 17 telephone settlement conferences as well as conducted numerous other negotiations outside the presence of Magistrate Judge Bernikow. Throughout this period rigorous discovery was conducted. Numerous depositions were taken and hundreds of documents produced.[3]

## I. The Proposed Settlement

The Proposed Settlement provides the following benefits to the Class: first, the Defendants will make a total of $8,250,000 in cash payments, which sum has been earning interest since March 10, 1994; second, the Defendants will pay the costs of notifying the Class of this Proposed Settlement, estimated to be approximately $60,000; and third, the Defendants will pay the costs of administering the Proposed Settlement, which could be as much as $350,000 plus the out of pocket disbursements of the Claims Administrator.

The Class Counsel's attorneys fees are to come out of the cash payment to the Plaintiff Class.

Notice of Settlement regarding the Proposed Settlement was sent out to the approximately 89,000 members of the Class by first class mail on May 17, 1994, in accordance with this Court's Order of May 4, 1994. Two hearings were conducted in this matter. The first was held on June 22, 1994 and the second, on July 19, 1994. As of July 19, 1994, proof of claims were filed by 21,500 Class Members and nearly 2,700 objections to the Proposed Settlement were received. Only twenty of these objections appear to have been authored by the Class Members who submitted them, the remainder having been solicited by Olick and submitted on forms drafted and distributed by him. Olick's opposition to the Proposed Settlement is discussed below.

## Discussion

"There are weighty justifications ... for the general policy favoring the settlement of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982) (Friendly, J.) (citing 3 Neuberg, Class Actions § 5570c at 479–80 (1977)), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see Chatelain v. Prudential–Bache Sec., Inc.*, 805 F.Supp. 209, 212 (S.D.N.Y.1992); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 590 (S.D.N.Y.1992).

It is well established that courts' principal responsibility in approving class action settlements is to ensure that such settlements are fair, adequate and reasonable. *See, e.g., Weinberger*, 698 F.2d at 73 ("The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate."); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. Unit A 1982) (noting that courts will not approve a class action settlement unless it is

---

**3.** The Plaintiffs also subpoenaed the following: (1) Bear Stearns & Co., the investment banker representing DOC; (2) D.F. King, the information agent for the solicitation in the transaction; (3) Paine Webber & Co, Inc. the investment bank representing Parker & Parsley; (4) Smith Bar-

ney; (5) Ryder Scott & Company, Cawley Gillespie Inc. and Williamson Petroleum, who were retained by either Damson partnerships or by Parker & Parsley to assist in valuation of the various oil and gas properties.

found fair, adequate and reasonable), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

The Second Circuit has held that nine factors are generally considered in determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323–24 (2d Cir.1990) (citing *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 684 n. 1 (2d Cir.1977) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974))).

Other Circuits have enumerated similar factors for consideration of proposed settlements. *See, e.g., Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir.1982) (settlement should balance several factors, which may include some or all of the following: strength of plaintiffs' case; risk, expense, complexity, and likely duration of further litigation; risk of maintaining class action status; amount offered in settlement; extent of discovery completed and stage of proceedings; experience and views of counsel; presence of governmental participant; and reaction of class members to proposed settlement); *Parker*, 667 F.2d at 1209 (enumerating six factors to be considered: (1) whether settlement was product of fraud or collusion; (2) complexity, expense and likely duration of trial; (3) stage of proceedings and amount of discovery completed; (4) factual and legal obstacles to prevailing on merits; (5) possible range of recovery and certainty of damages; and (6) respective opinions of the participants).

When previously faced with a proposed class action settlement, this Court focused first on the fairness of the settlement, then on its adequacy and reasonableness. *See States of New York & Maryland v. Nintendo of Am., Inc.*, 775 F.Supp. 676, 681 (S.D.N.Y. 1991) (approving settlement).

## A. *Fairness*

█ A fair settlement should be the result of good faith, arm's length bargaining undertaken by experienced counsel. *Nintendo*, 775 F.Supp. at 680–81 (S.D.N.Y.1991); *see also Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir.1982); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463–66 (2d Cir.1974). The record contains no indication of bad faith. Through counsel experienced in this type of dispute, both in and out of the presence of Magistrate Judge Bernikow, the parties negotiated at arm's length with the benefit of substantial discovery. On these findings the Court deems the Proposed Settlement fair.

## B. *Adequacy and Reasonableness*

█ In determining the adequacy and reasonableness of a Proposed Settlement the Court examines the following five factors:

> (1) the relative strength of plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defense the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

*Nintendo*, 775 F.Supp. at 681–82 (quoting *In re Montgomery County Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315–16 (D.Md. 1979)).

These five factors will be applied in turn to the Proposed Settlement.

### 1. *The Relative Strength of Plaintiffs Case on the Merits*

First, in light of the questionable merits of this action, the Proposed Settlement is adequate and reasonable. Even if Plaintiffs

proved able to satisfy all the elements required for each of their asserted claims, they would have serious difficulties establishing their damages. Indeed, given the return on their investment, it may well be that the Damson limited partners have benefitted significantly from the conversion of their Damson partnership interests.

Plaintiffs face the specific challenge of proving that the auction process was unfair, an arduous chore in the face of the paucity of evidence of any such unfairness uncovered in the discovery process. It is insufficient for the Plaintiffs to allege simply that there may be differing valuations of certain pre-Transaction Damson or Parker & Parsley assets. To prevail, the Plaintiffs must establish that the Independent Committee and its advisors willfully mismanaged the auction process in order to deliver the Damson assets to Parker & Parsley without adequate compensation to the Damson limited partners—no direct evidence has been cited to support the allegation.

Typically, class action challenges of corporate transactions question the propriety of actions taken by corporate directors. *See, e.g., Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 276–77 (2d Cir. 1986) (finding that directors failed to look beyond options supported by self-interested management); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1285 (Del.1989) (auction of a company requires intense scrutiny and participation of independent directors). In this case, a special committee of the DOC Board of Directors (the "Independent Committee") was created for the specific purpose of reviewing the Transaction. The Independent Committee was guided by counsel, conducted the auction and duly selected the highest bidder for the Damson assets. The bid selected was not that of insiders or existing managers.

Accordingly, given the circumstances of this Transaction, it appears that Plaintiffs would have considerable difficulty prevailing on the merits of their claims.

### 2. Difficulties of Proof or Strong Defenses

As has already been mentioned, Plaintiffs face substantial difficulties of proof. Defendants deny any violation of law and appear able to adduce evidence in support of several important defensive assertions.

First, Defendants Barrie Damson and William Ouzts initially proposed to acquire the Damson Partnership assets in the fall of 1989 through an entity they controlled, known as Crescent Natural Resources. This proposal was rejected by the Independent Committee. The rejection of a bid by two insiders, while not in itself dispositive, is an indicator that an unbiased, open auction was conducted, supporting an inference that the Independent Committee sought the best possible offer for the Damson partnership assets. Numerous bids other than those of Crescent and Parker & Parsley were submitted and reviewed by the Independent Committee's independent investment banker, Smith Barney, who ultimately determined that Parker & Parsley's bid was the most beneficial to the Damson limited partners.

Second, the proxy/prospectus had been drafted and negotiated by experienced counsel on both sides of the Transaction who were familiar with the disclosure requirements of the securities laws. These documents were duly reviewed and accepted by the SEC for filing and dissemination. The Defendants contend that the Transaction documents were accurate, disclosed all material facts and contained no material misstatements or omissions. At trial Plaintiffs would have to shoulder squarely the burden of rebutting this contention.

Third, the Transaction was negotiated at arm's length by the parties and was consistent with the underlying valuation of the assets as calculated using methods acceptable in the industry.

Fourth, the Damson Limited Partnerships, like most such oil and gas partnerships, were severely affected by the collapse of energy prices in the mid–1980s, causing huge losses which forced DOC, the partnerships' general partner, to the brink of bankruptcy long before the filing of the *Maywalt* Action. As a result, the Damson limited partnership units were virtually unmarketable prior to the Transaction. In addition, shortly after

the close of the Transaction, Parker & Parsley stock traded at about $10 per share. Since that time it has increased dramatically and is freely traded. Further, there was no shortfall in the exchange with the Damson investors in light of the actual net asset value of the Damson and Parker & Parsley partnerships. This apparent increase in economic value for the Damson limited partners poses a significant challenge to Plaintiffs' assertion that they were damaged by Defendants' conduct of the Transaction.

As previously mentioned, at trial Plaintiffs would have to prove that the Independent Committee conducted a faulty auction process and that their approval of the Transaction resulted in economic harm to the Plaintiffs. A costly and time-consuming battle of expert witnesses regarding the state of the oil and gas industry in the late 1980s and early 1990s would be unavoidable. Such battles being by nature "tit-for-tat" contests in which no expert's assertion goes unrebutted, Plaintiffs' difficulty in proving the merits of their claim appears quite substantial.

Plaintiffs' difficulties of proof at trial would extend to damages. Plaintiffs' assertion of damages begins with a "balance sheet" comparison of Damson assets against the Parker & Parsley assets. In compliance with regulations of the Securities and Exchange Commission, the present value of future income streams from certain Damson assets were calculated according to the so-called "SEC–10" methodology and included in the Proxy/Prospectus. Class Representatives seek to incorporate an "SEC–10" type of valuation of the future income streams into their "balance sheet" of the Damson partnerships. When this version of the Damson "balance sheet" is then compared against a "balance sheet" for the Parker & Parsley assets, it indeed appears that the potential damages in this case could be greater than the sum upon which the Proposed Settlement is based.

However, those supporting the Proposed Settlement have argued persuasively and proffered credible evidence to the effect that "SEC–10" methodology is inappropriate to the "balance sheet" comparison, inflates the actual present value of the income streams and is contrary to industry standards. While this conflict over valuation methods might present a battleground for expert testimony at trial, the industry standard defense is a strong one.

Finally, Defendants have not come to the settlement table because they are unwilling to see this action through to a litigated outcome. On the contrary, they appear prepared to vigorously and perhaps victoriously defend this action. Rather, it seems that a cost/benefit analysis has motivated the Defendants to choose the Proposed Settlement as the course which will least drain their resources and permit them to focus more of their time and energy on more economically productive pursuits.

### 3. *Anticipated Duration and Expense of Additional Litigation*

The anticipated duration and expense of the continuation of this litigation weighs in favor of the Proposed Settlement. As mentioned above, numerous experts will be required to testify as to the thoroughness of the auction process, the relative values of the oil and gas reserves, and the appropriate methods of financial valuation of those reserves and other assets. Further, the trial itself regarding these disputes is estimated to run anywhere from six to twelve weeks.

### 4. *Solvency of the Defendants and the Likelihood of Recovery on a Litigated Judgment*

Parker & Parsley is a solvent company and it does not appear that Plaintiffs would have any difficulty recovering a litigated judgment, should they prevail at all levels.

### 5. *Degree of Opposition to the Settlement*

■ Both Class Representatives and Olick have lodged objections to the Proposed Settlement. These are taken in turn. In its evaluation of these objections, the Court examines each for its merits, *see Wilder v. Bernstein,* 848 F.2d 1338, 1345–50 (2nd Cir. 1988) but also makes reference to its primary concern in the consideration of proposed settlements, which is to compare the terms of

the proposal with the likely rewards of litigation. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). In other words, an objection based on an assertion or argument not readily supportable at trial should not be permitted to bar settlement.

### a. *Class Representatives Objections*

In *Maywalt III,* this Court denied a motion to discharge Class Counsel, but noted that those representative plaintiffs [4] having objections to the Proposed Settlement could raise them at this stage of the settlement process. *Maywalt III,* 155 F.R.D. 494, 497 (S.D.N.Y.1994). At that time the Court noted that the objectors position as Class Representatives would weigh heavily in the Court's consideration of the Proposed Settlement, *id.,* but that objections by representative plaintiffs did not pose an insurmountable burden for the Proposed Settlement's proponents and that the law in this Circuit and others did not bar settlement over the objections of representative plaintiffs, *id.* (citing cases).

To empower the Class Representatives with what would amount to an automatic veto over the Proposed Settlement does not appear to serve the best interests of Rule 23 and would merely encourage strategic behavior "designed to maximize the value of the veto rather than the settlement value of their claims." *In re Ivan F. Boesky Sec. Litig.,* 948 F.2d 1358, 1366 (2d Cir.1991). "The courts have recognized that the duty owed by class counsel is to the entire class and not dependent on the special desires of the named plaintiffs.... The rationale implicit in these decisions is sound: the named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands." *Parker v. Anderson,* 667 F.2d 1204, 1211 (5th

Cir. Unit A 1982); *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1428, 1435 (E.D.N.Y.1989) (quoting *Parker,* 667 F.2d at 1211), *aff'd in part and rev'd in part,* 907 F.2d 1295 (2d Cir.1990) (affirming fairness of settlement; reversing denial of attorneys' fees.).

It is in this context that the four objections raised by the Class Representatives are considered. For the reasons set forth below, the merits of the objections do not bar the approval of the Proposed Settlement.

### (1) *The Valuation of the Damson Gas Plants Was Reasonable*

The Class Representatives contend that Barrie Damson's bid (the "Crescent Bid") for the Damson Limited Partnerships valued the Damson gas plants at $112 million,[5] or $18 million more than the $94 million value assessed by the Class' expert. The Class Representatives state that "[a]s a bidder for the properties, Damson had no incentive to overvalue them; his incentive more likely was to under-value the plants." (Class Reps.' Br. in Objection to Settlement at 5.)

In their response brief and at the July 19, 1994 Hearing, Class Counsel proffered two convincing responses to the Class Representatives' alleged $18 million shortfall. First, the $112 million valuation included a 10.5% interest that DOC held in the gas plants. This interest was never owned by the Damson limited partnerships and was not part of the Damson limited partners' contribution to the Transaction. (*See* Kaplin Supp. Decl. at ¶ 3b.) In addition, the valuation was made 15 months *prior* to the Parker & Parsley transaction, and failed to account for the 15 months' worth of production depletion. (*See* Kaplin Supp. Decl. at ¶ 3a.) According to Class Counsel, the combined effect of the removal of the 10.5% interest and the 15 months depletion would account for the $18

---

**4.** The Representative Plaintiffs are: Mary Ann Maywalt, Mary White, John Vosefski and J. Richard Aboud, DDS on behalf of the J. Richard Aboud DDS, Inc. Defined Benefit Pension Plan. Apparently Vivienne Galligan, as a result of her hospitalization due to a critical disease, is unable to participate in these proceedings. (*See* Mov. Rep.Pls.' Mem. of Law n. 1; LaBazzo Aff. ¶¶ 5, 9, 14.) In addition, it appears that a trustee for Vivienne Galligan has informed Class Counsel

that she intends to submit her proof of claim, to participate in the Proposed Settlement if approved by the Court, and to resign as a Class Representative due to her illness. (LaBazzo Aff. ¶ 14.)

**5.** *See* Burlingame Aff. at ¶ 3 which estimates fair market value to be $112,521,000 for Damson gas process plants.

million difference.[6] Class Counsel also notes that in February of 1990, Cawley Gillespie & Associates ("Cawley"), the independent auditor used by the Independent Committee, valued the Damson plant reserves at $90.5 million. All of this information strongly supports the reasonableness of the valuation of the gas plants used in the Transaction.

It is also persuasive to note, with the benefit of hindsight, that the subsequent litigation concerning the Hooker and Carthage plants substantially affected their valuation. Litigation concerning the Hooker plant yielded a determination that it was overvalued, forcing Parker & Parsley to write off the plants for $15 million. (Withrow Aff. in Support of Settlement at ¶ 6.) Litigation concerning the Carthage plant resulted in a determination that Union Pacific Resources Company had a right of first refusal which required that Parker & Parsley sell the plant to them for the valuation used in the Transaction.

Accordingly, it appears that the Class Representatives' objection based on the allegedly improper valuation of the Damson gas plants is contrary to the evidence marshalled through the discovery process and does not outweigh the guaranteed immediate benefits of the Proposed Settlement.

### (2) *The Valuation of Parker & Parsley's Management Operations Was Reasonable*

The Class Representatives also object to the inclusion of $20 million in the valuation of the Parker & Parsley assets for "Present Value Operating Income from Third Party Properties." This amount was included in the valuation to represent the present value of the future income stream resulting from Parker & Parsley's management of third-party wells. Terming this amount an "adjustment," Class Representatives assert that it is based on the questionable prospective assumption that Parker & Parsley will raise $50 million in drilling funds annually for the next ten years. Viewing this question from the perspective of possible success at trial, it is apparent that the valuation used in the Transaction would be defensible. A reputable securities firm assigned a present value of $37 million to this income stream in 1991, (*see* Markham Supp. Aff., Exh. A.), and the activities in question have produced an annual income of at least $2.6 million for the last ten years, (*see* Class Counsel's Reply Br., at 10).

Given the documentation produced by Class Counsel and the risks involved with litigating a valuation question such as this, it appears, as with the valuation of the gas plants, that this objection fails to the outweigh immediate benefits yielded by the Proposed Settlement.

### (3) *Omission of Undeveloped Damson Oil and Gas Reserves from the Transaction*

Class Representatives complain that certain classes of Damson's oil and gas reserves were omitted from the valuation of the Damson assets in the Transaction, which omission negatively affected the compensation to the Damson limited partners in the Transaction. Class Representatives assert that these assets were worth $35.8 million, which sum would have had a substantial upward impact on damages recoverable in a litigated outcome.

This assertion is based on Damson's own internal valuation of the reserves in question, which was never independently confirmed. (Kaplin Suppl.Decl. at 3; Class' Reply Brief, at 12.) In addition, this claim includes two classes of reserves, Probable Reserves and Possible Reserves, which are apparently not includable in valuation analyses such as the one involved in the Transaction, as a matter of general industry practice. (Kaplin Suppl. Decl. at 3.) Regarding the remaining classes of Damson reserves, Class Representatives' and their expert apply an inadequate discount rate and neglect to apply any risk factor to account for the fact that these reserves are, in fact, not developed. (Kaplin Suppl.Decl. at 3; Class' Reply Brief, at 12–13.) Taken together these shortcomings are fatal to Class Representatives' objection

---

**6.** In fact, Class Counsel contends that adjusting for Burlingame's errors, the Damson valuation would be below the $94 million amount previously estimated by Kaplin. (*See* Kaplin Supp. Decl. at ¶ 4.)

based on the omission of the undeveloped Damson reserves from the Transaction.

#### (4) *The Insurance Claims Against Damson are Irrelevant*

The Class Representative's final objection is that the Proposed Settlement has somehow bartered away possible claims concerning a set of reserve insurance policies owned by the Damson partnerships. The gravamen of this objection, however, is seriously undermined by Class Representatives' concession that this "claim may not be asserted appropriately in the instant action." (Class Representatives Br. at 14.)

The Damson partnership interests were sold between 1978 and 1985. For two of these partnerships, DOC apparently purchased reserve insurance policies from the St. Paul Fire and Marine Insurance Company which insured against the risk that the quantities of oil in the geologic reservoirs beneath the partnerships' wells might turn out to be less than certain specified amounts. Due to the ambiguous nature of these policies, a dispute arose between the DOC and the insurers which was ultimately resolved after years of negotiations and the coverage amounts were lowered to $15 million. After the close of the Transaction, Parker & Parsley analyzed the terms of these policies and determined that a shortfall large enough to be covered by the policy was unlikely and, as a result, the policies were valueless.

Class Representatives appear to suggest the existence of potential claim against Defendant Barrie Damson arising out of the reissuance of those policies with lowered coverage amounts in 1989. Since the reissuance of those policies has little or no factual connection or logical relevance to the issues pleaded in either of the *Maywalt* or *Lindenauer* Actions, it can have no bearing on the approval of the Proposed Settlement.[7]

None of the objections of Class Representatives, when examined with an eye toward success at trial, can stand against the immediate benefits that will inure to the Plaintiff Class from the Proposed Settlement.

#### b. *Olick's Objections*

Olick, a Class Member, is the self-described instigator of this law suit.[8] On April 11, 1994, Olick filed a motion opposing the Proposed Settlement. At some point after the filing of his objection, Olick sent out a mass mailing to an unknown number of Class members, without this Court's oversight.[9] In this mailing Olick urged Class members to file pre-printed form objections which he provided in lieu of their Proof of Claim forms. More than 500 of such pre-printed objections have been received.

Olick's form objections include the following assertions: (1) the Proposed Settlement is completely inadequate because the total damages recoverable in the two actions should be $150 million;[10] (2) Class Counsel has not consulted a sufficient number of oil and gas engineers or accountants; (3) the Proposed Settlement "may" preclude claims regarding the cancellation of the St. Paul reserve insurance policies; and (4) Class Counsel failed to explain the basis for believing the Proposed Settlement to be fair and reasonable.

---

7. Neither the Crescent nor the Parker & Parsley offer concerned the insurance policies. None of the federal securities claims in either this action or in the *Lindenauer* action refer to these policies. Further, the release in the Proposed Settlement only refers to potential claims "arising out of or in any way connected to the Transaction." "Transaction" is defined as the 1991 merger between Parker & Parsley and Damson.

8. Apparently, Olick initiated the solicitation of what he alleges was a $300,000 litigation fund to be used to pay the various law firms. (Olick Aff. at ¶ 1.)

9. The Second Circuit has held that a District Court may limit communications with class members based on a finding that such communi-

cations may pressure class members, chill their rights or create confusion, thus undermining the efficacy of Rule 23. *See Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 601–02 (2d Cir.1986) (citing *Gulf Oil v. Bernard,* 452 U.S. 89, 101–02, 101 S.Ct. 2193, 2200–01, 68 L.Ed.2d 693 (1981)).

10. This extrapolation appears to be based on a valuation of certain of the Damson assets made at the peak of the autumn 1990 spike in oil prices caused by the Iraqi invasion of Kuwait. As discussed previously in this Opinion, a more realistic damage recovery, were the Class to prevail at trial, would be closer to $20 million.

These objections all appear to lack validity. First, Olick has not furnished any basis for his first objection concerning the amount of damages recoverable. As discussed earlier, the monetary basis for the Proposed Settlement appears to be fair in light of the risk involved in this uncertain litigation. Second, as discussed above, Class Counsel has relied extensively on a variety of engineering and financial assistance. Third, for the reasons set forth above, the reserve insurance policies have no bearing on this action and cannot be the basis of a viable objection in this context.

The most significant of Olick's objections is his contention that Class Counsel did not adequately outline its reasoning concerning the fairness and adequacy of the Proposed Settlement. Class Counsel counters that it informed each of the plaintiff representatives of the terms of the proposed settlement in January 1994, three months before the Stipulation was executed. Until the filing of the Class Representatives Order to Show Cause seeking to discharge Class counsel, served on June 3, 1994, the Class Representatives allegedly did not contact Class Counsel with their concerns.

Class Counsel met with Olick on March 5, 1994 for 10 hours and explained:

the claims and theories of both the class and the defendants, the balance sheet calculations of the Damson and Parker & Parsley partnerships, the analysis of the class' petroleum engineer, Mr. Kaplan [sic], and investment banker experts, the internal business plan documents described above, the computerized reserve reports created by the outside petroleum engineers for both merger partners in 1990, the gross errors and oversimplifications in objector's general conclusions and opinions . . . , the risks and proof problems inherent in the subjective evaluation of the PUDs, the analysis in Parker & Parsley's contemporaneous business plan analysis, *and* Judge Bernikow's views and evaluation of the settlement value of the case.

(Counsel Br. in Support of Proposed Settlement at 35–36 (emphasis in original)).

The legal significance of the adequacy of Class Counsel's briefing of the Class Representatives and Olick on the merits of this Proposed Settlement was resolved in the prior opinion of this Court in *Maywalt III*, 155 F.R.D. 494 (S.D.N.Y.1994) (denying Class Representatives' motion to discharge Class Counsel). It is regrettable that the attorney-client relationship among Class Counsel and the Class Representatives and Olick disintegrated to the extent that a discharge motion was brought at such a late date in these unhappy proceedings. However, complaints concerning Class Counsels' poor communication skills [11] cannot be substituted for the factual judgment that the Proposed Settlement fairly and adequately serves the interests of the larger class membership.

Accordingly, Olick's objections cannot stand when weighed against the greater benefit served to the Class Members by the Proposed Settlement. The possibility of a damage award greater than the Proposed Settlement amount does not nearly outweigh the very substantial risk entailed in pursuing a continued course of litigation in reliance upon the potential evidence as it has been revealed to date in this action. The number of objectors in relation to the size of the entire class is relatively small and the source of their objections appear to be nothing more than Olick's pre-printed forms which are founded on incomplete, if not inaccurate, information.

None of Olick's objections can stand as a bar to settlement. The Proposed Settlement in this action is approved. It is (a) fair in light of a negotiating process that was conducted by experienced counsel and free of coercion or collusion, and (b) adequate and reasonable in light of the "substantive terms of the settlement compared to the likely result of a trial. . . ." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983).

---

**11.** Never, at any point in these proceedings did Olick or the Class Representatives claim that Class Counsel had engaged in any improprieties during the course of this action. As noted in *Maywalt III*, Class Counsel will be permitted to represent the greater Class membership in the absence of acts of impropriety by Class Counsel, or a showing of the abridgement of a significant minority of the Class' rights.

## II. *Fees for Attorneys*

### A. *Application of Class Counsel*

#### 1. *Reasonable Hourly Rates*

■ Under the American Rule, a prevailing party generally is not permitted to collect fees from the loser. However, there are several exceptions to this rule: (1) a losing party may be forced to pay the "reasonable fees" of the prevailing party under "fee shifting" provisions found in numerous federal statutes, such as 42 U.S.C. § 1988; (2) courts may assess fees in order to secure a party's compliance with the wilful violation of a court order; (3) courts may assess fees against parties who have acted in bad faith or vexatiously; and (4) under their equitable powers courts may award attorneys' fees to plaintiffs who have recovered a "common fund"[12] for themselves and others. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561–62 & n. 6, 106 S.Ct. 3088, 3096–97, 92 L.Ed.2d 439 (1986); *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 257–59, 95 S.Ct. 1612, 1621–22, 44 L.Ed.2d 141 (1975). This case is one which fits under the "common fund" rubric.

■ The law of the this Circuit further specifies that "the starting point of every fee award ... must be a calculation of the attorney's services in terms of the time he [or she] has expended on the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir.1974). This rule requires the court to multiply the number of hours reasonably expended by a reasonable hourly rate to arrive at a reasonable attorneys' fee award. *Id.* at 471. This method has come to be known as the "lodestar" formula. *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir.1987) (describing lodestar approach), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

■ In setting the hourly rates of attorney fees trial courts usually look to the hourly rate employed in the judicial district in which they sit, *see id.* at 232, in this case the Southern District of New York, *see, e.g.,* *Miele v. New York State Teamsters Conference Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir.1987) (trial judge may rely on his or her knowledge of prevailing community rates); *Loper v. New York City Police Dep't*, 853 F.Supp. 716, 719 (S.D.N.Y. 1994) (awarding fees to sole practitioner with offices in both Manhattan and Hoboken at a rate commensurate with the Southern District litigation); *McGuire v. Wilson*, 87 Civ. 6161, 1994 WL 68222 at *3, 1994 U.S.Dist. LEXIS 2000, at *7–9 (S.D.N.Y. Feb. 25, 1994) (awarding Long Island law firm fees at New York City rates for Southern District litigation); *Shlomchik v. Richmond 103 Equities Co.*, 763 F.Supp. 732, 743–44 (S.D.N.Y. 1991) (awarding suburban Philadelphia attorney a higher New York City rate for case litigated in Southern District).

■ Class Counsel will be remunerated according to the lodestar approach. The hourly rates requested by the Class Counsel firms are listed below. The rates requested comport with this Court's sense of the range of rates employed in this district. *See Miele*, 831 F.2d at 409.

| Attorney | Hourly Rate |
|---|---|
| Law firm of Sullivan, Hill, Lewin & Markham: | |
| Engel | 300 |
| Glavis | 230 |
| LaBazzo | 290 |
| MacKinnon | 300 |
| Markham | 325 |
| McMeans | 275 |
| Fissel | 190 |
| Leahy | 190 |
| McRoberts | 190 |
| Scharfen | 190 |

The documentation provided by the Sullivan firm in support of its fee request, although adequate in most respects, provided only initials for attorneys on the actual time report. Lawyers' full names were provided in a firm resume. In two instances, however, there appears to be no lawyer for the initials on the time report, and thus no fees will be awarded for the two unidentified attorneys. Accordingly, the Sullivan firm's total lodestar calculation is reduced by $8,328 to $798,508.50.

---

**12.** These are also sometimes referred to by courts as "equitable fund" or "common benefit" cases.

Law firm of Kaplan, Kilsheimer & Fox:

| | |
|---|---|
| Kaplan (P) | 390 |
| Kilsheimer (P) | 330 |
| Sterling (A) | 170 |
| Zeller (A) | 170 |
| Tadler (A) | 155 |
| Ganz (A) | 110 |
| Lyons (LC) | 90 |
| Weiss (LC) | 90 |

The Kaplan firm's total lodestar calculation of $419,019.20 is approved.

Law firm of Wolf, Popper, Ross, Wolf & Jones

| | |
|---|---|
| Oestreich | 425 |
| Jacobs | 315 |

The Wolf firm's total lodestar calculation of $375,429 is approved.

Law firm of Bradford & Decker

| | |
|---|---|
| Bradford | 250 |
| Decker | 250 |
| Gilsinger | 200 |

Bradford & Decker's documentation suffers from exactly the same shortcoming as does that of the Sullivan firm—unidentified attorneys. Accordingly their lodestar calculation is reduced $2,790 from $382,697.50 to $379,-907.50.

Bradford's declaration also makes reference to an "of counsel" relationship with one Clifford R. Ribner, an attorney who worked on this case for the Bradford firm. Ribner's lodestar calculation of $35,175 is approved on the basis of Bradford's declaration and accompanying documentation of Ribner's hours and rate.

■ A fee application must be supported by contemporaneous time records which describe with specificity the work done. *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). The "burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987) (rejecting time records with insufficient descriptions of attorney's work). The Supreme Court has found that "counsel, of course, is not required to record in great detail how each minute of his time was expended but at least counsel should identify the general subject matter of

his time expenditures." *Hensley v. Eckerhart,* 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 1942 n. 12, 76 L.Ed.2d 40 (1983).

Except as noted above, Class Counsel's billing records meet this burden. The documentation regarding the efforts of this veritable army of attorneys has been presented in a summary form which is accepted by this Court as an accurate appraisal of their work product.

Accordingly, with the above-stated exceptions, the fee requests of Class Counsel are reasonable and are hereby approved.

### 2. *Multipliers Will Not Be Awarded*

■ Class Counsel urges the Court to apply a multiplier of 1.22 to their lodestar calculation. Class Counsel argues that it should be granted the requested multiplier for the following reasons: (1) risk of the litigation; (2) the complexity and magnitude of its task; (3) the quality of representation; (4) the results achieved; and (5) for "public policy" considerations.

■ Traditionally, the party advocating any departure from a lodestar calculation bears the burden of establishing that such departure is necessary for a reasonable fee award. *See United States Football League v. National Football League,* 887 F.2d 408, 413 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990); *Loper v. New York City Police Dep't,* 853 F.Supp. 716, 721–22 (S.D.N.Y.1994); *see also Homeward Bound, Inc. v. Hissom Memorial Ctr.,* 963 F.2d 1352, 1360 (10th Cir.1992). It is settled in this Circuit that fee enhancements are not permissible under fee-shifting statutes. *See City of Burlington v. Dague,* —— U.S. ——, ——–——, 112 S.Ct. 2638, 2643–44, 120 L.Ed.2d 449 (1992) ("*Dague II*"); *Dague v. City of Burlington,* 935 F.2d 1343, 1359 (2d Cir.1991) ("*Dague I*"); *Amalgamated Clothing & Textile Workers Union v. Wal–Mart Stores,* No. 92 Civ. 5517, 1994 WL 74871, at *6 (S.D.N.Y. Mar. 7, 1994) (stating that in *Dague II* "the Supreme Court ruled out the use of multipliers in statutory fee shifting cases by holding that a multiplier was not justified based upon a contingency risk."); *Dubin v. E.F. Hutton Group,* 845 F.Supp.

1004, 1014 (S.D.N.Y.1994) (stating that *Dague II* "culminated a series of Supreme Court decisions restricting post-lodestar multipliers or fee enhancements in statutory fee shifting cases"); *Loper,* 853 F.Supp. at 722–23 (synthesizing the holdings of *Dague I* and *Dague II* ).

However, the law concerning multipliers in "common fund" cases such as this one is not as well developed. One Circuit has recently held that the prohibitions of *Dague I* and *Dague II* and their progeny are wholly inapplicable in common fund cases and has permitted the application of a multiplier in the common fund context. *See Florin v. Nationsbank of Georgia,* 34 F.3d 560 (7th Cir. 1994). In a common fund case decided prior to the *Dague* cases the Second Circuit noted that such cases afforded courts more "leeway" than statutory fee-shifting cases in the use of multipliers, upheld a multiplier awarded in recognition of counsel's exceptional service to class plaintiffs and approved the degree of benefit to class as a touchstone for a court's scrutiny of attorney hours billed to the common fund. *See In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 234–35 & n. 2, 237 (2d Cir.1987) (upholding application of a "quality" multiplier). It has also been pointed out that in common fund cases, unlike statutory fee-shifting case, the interests of the class of plaintiffs and its attorneys diverge at the award of attorneys' fees because the lawyers' payment diminishes the plaintiffs' recovery. *See Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir.1993) (upholding a "risk" multiplier in a common fund case).

The Court takes some guidance from the *Dague* cases' apparent proscription against fee enhancements since it has been said that "the overriding purpose of fee shifting statutes, to ensure adequate representation in socially desirable litigation is identical to the ultimate rationale of the equitable fund [or common benefit] doctrine." *In re Bolar Pharmaceutical Co. Sec. Litig.,* 800 F.Supp. 1091, 1096 n. 7 (E.D.N.Y.1992). With this identity of purpose in mind, the Court notes that in *Dague II* the Supreme Court severely narrowed the circumstances in which an enhancement is available by "establish[ing] a

'strong presumption' that the lodestar represents the 'reasonable fee.' " *Dague II* —— U.S. at ——, 112 S.Ct. at 2641 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986)).

Class Counsel's first justification for enhancement is risk. The Second Circuit has gone so far as to question "[t]he propriety of ever allowing a risk-enhancement." *See In re Bolar Pharmaceutical Co. Sec. Litig.,* 966 F.2d 731, 732 (2d Cir.1992). It has also been held that the goal of providing adequate incentive for socially desirable risk-taking by counsel is "fully served by the lodestar equation" and "[e]nhancement for the lodestar figure would double-count counsel's risk-taking." *Amalgamated Clothing,* 1994 WL 74871, at *6; *see also Bolar,* 800 F.Supp. at 1097 (holding, in a common fund case, that the "risk" argument was foreclosed by *Dague II* since counsel presumably considered the risks involved before taking the case and that awarding a risk-based enhancement would give counsel a "windfall.")

Consideration of the *Dague* cases, *Agent Orange* and *Bolar* against the circumstances presented here reveals the lack of the exceptional circumstances needed to rebut the presumption that the lodestar is a reasonable fee. Further, as a matter of public policy, judicial encouragement of this type of action appears to be unnecessary. *See In re Agent Orange,* 818 F.2d at 236. Additionally, with regard to Class Counsel's risk bearing, the Court notes that Class Members raised a so-called "litigation fund" before Class Counsel accepted this case, thereby significantly reducing the risk Class Counsel actually took on.

Class Counsel's next justification for the requested multiplier is the complexity and magnitude of this litigation. Large and complex cases require more of an attorney's time, and time is exactly that measure by which the lodestar method compensates Class Counsel. Class Counsel's services, although apparently adequate, do not appear to have yielded any special benefit to the Plaintiffs with regard to the complexity or magnitude of the case.

Class Counsel also note the result achieved, i.e. this settlement, as further justification for enhancement. However, there appears to be nothing particular about this settlement which provides a basis for compensating counsel beyond that which is presumed to be a reasonable fee. *See Delaware Valley*, 478 U.S. at 565, 106 S.Ct. at 3098.

Finally, Class Counsel advance the quality of their representation as another justification for enhancement. First, quality of representation is presumed to be fully reflected in an initial lodestar calculation. *See Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984). Only when a fee applicant offers specific evidence that the quality of service rendered was superior and the success achieved was exceptional should a multiplier be applied. *In re Agent Orange*, 818 F.2d at 234 (citing *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549); *see also Delaware Valley*, 478 U.S. at 565, 106 S.Ct. at 309. No such specific evidence has been adduced and a quality multiplier will not be applied.

Finally, Class Counsel has failed to proffer any recent or specific justification as to how public policy has been served by this case. As Judge Wood has recently noted:

> [t]he public policy considerations in this litigation are not a factor justifying enhancement of the award of attorneys' fees over and above the amount that would be awarded in a fee shifting case. Even in cases where Congress finds sufficient public interest that it specifically encourages litigation by providing a statutory fee shifting mechanisms, courts have rejected a multiplier. Where, as here, Congress has not taken such steps to encourage litigation, there is no basis for providing any multiplier.

*Amalgamated Clothing*, 1994 WL 74871, at *6.

Accordingly, applying the still evolving jurisprudence of attorneys' fees in common fund cases to the facts presented in this action, Class Counsel's request for a multiplier is hereby denied.

### 3. *Expenses*

The Class Counsel firms have provided adequate accountings of litigation expenses which tie the purported expenses to a specified legal product. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1269 (2d Cir.1987) (reducing award for expenses by 25% where records were "inadequate to permit a determination of the nature or timing of the activities that required most individual expenditures"); *Carrero v. New York City Hous. Auth.*, 685 F.Supp. 904, 909–10 (S.D.N.Y.1988) (disallowing fees for inadequate documentation of expenses), *modified on other grounds*, 890 F.2d 569 (2d Cir.1989).

Class Counsel is therefore entitled to full reimbursement for their expense claims. The reimbursements granted are as follows:

| | |
|---|---|
| Sullivan, Hill | $52,262.86 |
| Kaplan, Kilsheimer | $81,850.45 |
| Wolf, Popper | $22,180.18 |
| Bradford & Decker | $11,267.18 |
| Ribner | $ 257.00 |

### III. *Fee Application of Olick*

In a document styled as an Amended Expense Reimbursement Request (the "Olick Application"), Olick applies for $174,333.71 which sum he characterizes as "expenses." The Court takes this document as an application for fees and expenses. Although Olick is not an attorney, it appears to have been the understanding of the relevant parties, as evidenced by Article IX of the Notice of Settlement, that Olick intended to make this application. Based on the facts before the Court his application for fees for services and expenses is treated in three parts, pertaining to three different time periods.

### A. *Prior to October 26, 1992*

Prior to the commencement of this litigation Olick raised funds from former Damson limited partners, deposited these funds in an account which he controlled (the "Olick Fund"), worked in furtherance of the commencement of this action and paid himself for his work and expenses from the Olick Fund. (Kilsheimer Aff. of Aug. 17, 1994, at 4; Olick Application, Exh. 5 at 1). Just prior to the retention of those attorneys who are now Class Counsel, an additional $189,260.61

was raised from Class Members and deposited in a second account controlled by Class Counsel (the "Class Counsel Account"). Olick performed services at the behest of Class Counsel and was compensated for his work and reimbursed for his expenses from the Class Counsel Account. (Markham June 10, 1994 Aff., Exh. B at 1; Olick Application, Exh. 7 at 1–2.; Kilsheimer Aug. 17, 1994 Aff. at 3.) Since Olick controlled funds from which he was paying himself and was also working with and for Class Counsel during the period prior to October 26, 1992, the Court sees no reason to now award him additional money for fees and disbursements during that period.

### B. *From October 26, 1992 to January, 1994*

 Class Counsel informed Olick in a letter dated October 26, 1992 that he would not be paid for any work from the Class Counsel Account unless that work was first expressly approved by Class Counsel. This cautionary advice was reiterated by Class Counsel in a letter to Olick dated January 19, 1993. (*See* Olick Application, Exh. 7 at 1–2). Olick has submitted documentation which purports to show his expenditure of considerable time after receiving that letter. This work was neither requested nor supervised by Class Counsel.

It appears that Olick's request is predicated on Article IX of the Notice of Settlement, and proceeds on the assumption that Olick's reimbursement from a future settlement for his self-supervised activities was contemplated by the parties. If it was, there appears to be no legal justification for the relationship that existed during this period. Case law provides numerous examples of and substantial guidance on awards of fees to non-lawyers who work with lawyers in prosecuting a lawsuit. *See In re Bolar Pharmaceutical Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir.1992) (fee for consultants); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 230 (2d Cir.1987) (ruling on proper fee for experts who prepared reports which proved unhelpful to plaintiffs' counsel); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 101 (2d Cir.1984) (consultants); *White v. Auerbach*, 500 F.2d 822, 826 (2d Cir.1974) (accountants' fees); *Larchfield Corp. v. United States*, 373 F.2d 159, 167 (2d Cir.1966) (accountants' fees). *See also Todd Shipyards Corp. v. Director, Office of Workers' Compensation Programs*, 545 F.2d 1176, 1181 (9th Cir.1976) (permitting payment of fees to non-lawyer who worked with attorney as a paralegal). But there is no precedent for the awarding of fees to a non-lawyer based on a free-lance relationship such as would have existed if Article IX were read as evidence of the parties' mutual consent to payment from the settlement to Olick for his unsupervised activities.

Reference to the legal theory which underlies fee awards in "common fund" cases highlights the problems of a fee award to an unsupervised non-lawyer. A court's authority to award fees in a "common fund" case derive from its historic equity jurisdiction. It is only applicable when a litigants efforts directly benefit others, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991) (citing *Alyeska*, 421 U.S. at 257, 95 S.Ct. at 1621), and only to that extent, *see United States v. 110–118 Riverside Tenants Corp.*, 5 F.3d 645, 646 (2d Cir.1993). Identifying and quantifying any benefit which may have inured to the Class Members from the activities of an unsupervised non-lawyer is difficult as a practical matter. Despite the abundance of lawyer-like diary entries Olick has submitted, the Court cannot see how or how much Olick's activities during this period benefitted the Plaintiff Class. Without the commonly understood practices and procedures of a law firm engaged in the prosecution of a suit to provide a framework, no link can be made to class benefit.

The combination of Olick's non-lawyer status and his membership in the plaintiff class raises an additional problem with his request as to this period. Regardless of his fee application, Olick, as a Class Member, has a right to eventually receive a *pro rata* payment from settlement. The compensation he seeks is apart from that right to payment. It has been suggested that the actions of a non-lawyer in pursuit of a recovery on behalf of a group of litigants of which that non-

lawyer is a member must have special significance if they are to warrant compensation greater than the non-lawyer's *pro rata* share of the recovery. *See In re Emergency Beacon Corp.*, 52 B.R. 979, 994 (Bankr.S.D.N.Y. 1985). Olick's submissions, although asserting hundreds of hours of time expended, support no inference as to the significance of his labors. In view of Olick's uncertain status—he is not an attorney, an accountant, a petroleum expert, a securities expert—the Court peruses the submissions before it for assurance that Olick would not be compensated for insignificant or unproductive pursuits, and finds none. For these reasons, no fees or expenses are granted for the period between Oct. 26, 1992 and January, 1994.

### C. *After January, 1994*

■ Olick's activities after January of 1994 were devoted to unsuccessfully seeking the removal of Class Counsel and opposing the Proposed Settlement. To be entitled to a fee award Olick, as an objector to a settlement, must show that the settlement was improved as a result of his opposition efforts. *See White v. Auerbach*, 500 F.2d 822, 828 (2d Cir.1974); *see also Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 546 (5th Cir.1980) (fee justified when objectors performed a "valuable service" to plaintiff class by opposing settlement).

Although the Proposed Settlement is herein approved over Mr. Olick's objections, it appears that a modest benefit inured to the Plaintiffs from Mr. Olick's activities in opposition. Debate instigated by Olick has had a salutary effect on the settlement process. The arguments and documentation presented by those supporting the Proposed Settlement in response to objections raised by Olick have shed additional light and served to provide greater certainty to the Court's conclusion that the Proposed Settlement is fair, reasonable and adequate. Without Olick's efforts, the degree of certainty for all concerned would have been lessened somewhat. Accordingly, Olick will be awarded fees and expenses for the period from January to June, 1994.

The Court's doubts concerning the nature of Olick's unsupervised efforts pertaining to the prior period, during which his efforts were redundant of those of Class Counsel and which efforts should have been supervised by counsel, are not present in the case of his opposition. His accounting of his time appears to be a reasonable representation of his efforts.

### 1. *Olick's Fees*

■ Olick has requested an hourly rate of $75.00, which the Court finds to be in the reasonable range of rates paid in this District for investigators, certain types of consultants and paralegals. Olick's fee for services in this period is $24,281.25.

### 2. *Olick's Expenses*

Olick will be reimbursed for his expenses for the period in the amount $960.98 based on the accounting he has presented.

As with the various Class Counsel firms, the record of Olick's services in opposition to the settlement has been presented in a summary form which is accepted by this Court as an accurate appraisal of his work. He has also provided an adequate accounting of his expenses.

### IV. *Letter Motion for an Extension of Time for Filing of Notices of Claim*

Olick submitted a document to the Court styled as a "motion" but not filed as one, seeking an extension of the September 16, 1994 deadline for the submission of Notices of Claim by the Class Members. Since that date is past Olick's motion is now moot, but were it not, this Court would hardly be inclined to impose further delay on this protracted and contentious matter. For the same reason, to the extent that Olick's motion could be taken as one to re-open the time for Class Members to file Notices of Claim, such motion is hereby denied.

### *Conclusion*

For the reasons set forth above, the Proposed Settlement is hereby approved. Class Counsel's fee request is hereby granted with the adjustments noted for insufficient documentation and without the requested application of a multiplier. Olick's Amended Expenses Reimbursement Request seeking fees

for services and expenses is hereby denied with respect to all fees and expenses requested prior to January 1994, and is hereby granted with respect to fees and expenses requested for the period from January through June, 1994. Finally, Olick's letter motion for an extension of the deadline for the filing of Notices of Claim, or alternatively, for the reopening of such time for filing, is hereby denied.

Settle order on notice.

It is so ordered.